UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MICHAEL J. WALRO, as Trustee of the )
Bankruptcy Estate of Lester L. Lee, )
                                     )        1:16-cv-03053-RLY-DML
                         Plaintiff,  )
            vs.                      )
                                     )        Adversary Proceeding
ROBERT N. HATFIELD and THE LEE       )        14-59038
GROUP HOLDING COMPANY, LLC,          )
                                     )
                         Defendants. )
_____      )
                                     )
IN RE:                               )
                                     )        Bankruptcy Case
LESTER L. LEE,                       )        12-90007-JJG-7
                                     )
                         Debtor.      )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Michael J. Walro, as Trustee of the Bankruptcy Estate of Lester L. Lee, initiated

this adversary proceeding against Robert N. Hatfield and The Lee Group Holding

Company, LLC, seeking to avoid a fraudulent transfer made to Hatfield by a subsidiary

of the Lee Group pursuant to the Indiana Uniform Fraudulent Transfer Act.  The

bankruptcy court below held a trial and issued Proposed Findings of Fact and

Conclusions of Law.  The Trustee and Hatfield now object to various portions of those

proposed findings.  Having reviewed those objections, the court now adopts the

bankruptcy court's proposed findings and conclusions in substantial part, and holds that

the Trustee is entitled to avoidance of the transfer.

**I. Standard of Review**

If a bankruptcy judge determines that an adversary proceeding is related to the underlying bankruptcy but not a "core proceeding" over which it can exercise full jurisdiction, the judge may hear the matter and then submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1). "[A]ny final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." *Id.* The district court may accept, reject, or modify the bankruptcy court's proposed findings and conclusions, receive further evidence on them, or remand the matter to the bankruptcy judge. Fed. R. Bankr. P. 9033(d). For ease of reading, the parties' objections are discussed as endnotes to the findings and conclusions at issue.[i]

**II. Findings of Fact**

1.     Lester L. Lee filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code on January 3, 2012.

2.     The Lee Group is an Indiana limited liability company that was managed by Lee and owned by Lee's wife, Brenda Lee, and their children, Larry L. Lee, Melinda Gabbard, and Debra Brown.

3.     Lee's Real Estate Investments, LLC ("LREI") was the owner of real property located at 130 N. State Street in North Vernon, Indiana (the "Real Estate"). LREI is a wholly-owned subsidiary of the Lee Group, which is the sole member of LREI.

4.     The Real Estate consists of two parcels: an office building that had long served as office space for the Lee Group and some of its subsidiary companies (the "Office Building"), and an adjacent single-family home that has been converted to retail space (the "Retail Unit").  During its conversion, the Retail Unit's full bathroom and kitchen were removed, leaving only a half bath.

5.     Hatfield is a resident of Jennings County and, at all times relevant to this proceeding, was employed by Lee's Ready Mix and Trucking, Inc.  He currently serves as the company's Vice President of Sales.[ii]

6.     Lee's Ready Mix is owned by Lee's family members, including Brenda and Larry.  Larry serves as its President.

7.     Lee and his related business entities are well known within Jennings County.

8.     On February 19, 2014, Hatfield and LREI entered into a Purchase and Sell Agreement (the "Purchase Agreement"), whereby LREI transferred the Real Estate to Hatfield (the "Transfer").

9.     Hatfield testified that he had long been interested in buying commercial property as part of his retirement plan—something that was commonly known within Lee's Ready Mix.  At the time of the Transfer, Hatfield was 57 years old and testified that he hoped to retire between the ages of 62 and 65.

10.     Hatfield further testified that Larry—knowing of Hatfield's interest— approached him about buying the Real Estate.

11.     Hatfield later discussed the sale with Lee and eventually inspected the Real Estate.  Hatfield also checked the tax assessment valuation of the Real Estate, which was $342,000 at that time.  Significantly, Hatfield did not have the Real Estate independently appraised or professionally inspected.  It does not appear that Hatfield asked for or reviewed the rental history for the Real Estate; nor did he obtain a title search.[iii]

12.     Hatfield testified that he likes to conduct business on the strength of a handshake.[iv]

13.     Neither LREI nor the Lee Group listed the Real Estate for sale with a broker.  The Real Estate was never formally marketed in any way.

14.     According to Lee, one of the primary motivations for selling the Real Estate was to pay attorney's fees for the Lee Group.  He also testified that "everybody" in town was aware of his bankruptcy, including Hatfield.

15.     Hatfield testified that he believed he could purchase the Real Estate for a "good price."  He acknowledged knowing that Lee "needed money" around the time of the Transfer, and that he had witnessed the Lee Group dwindle from a once vibrant company to almost nothing.  Hatfield also noted that while the Real Estate had once been "full of people," it was only being used by a handful of people at the time of the Transfer.  Hatfield had also heard rumors about litigation between Lee and some of his family members.[v]

16.     Initially, Lee asked for $145,000 to $150,000 for the Real Estate.  Hatfield countered with an offer of $125,000.  That offer was accepted (the "Purchase Price").

17.     Pursuant to the Purchase Agreement, Hatfield was to pay $10,000 to LREI upon execution of the contract.  Hatfield further agreed to give LREI a mortgage on the Real Estate for the remainder of the Purchase Price (the "Mortgage"), along with a promissory note (the "Note").

18.     Hatfield paid the initial $10,000 deposit with a check made payable to the Lee Group.  He testified that while he had sufficient funds to pay the entire Purchase Price upon execution of the Purchase Agreement, he preferred to pay over five to ten years.

19.      The Note was to be paid in annual installments over 20 years.  The first installment was not due until February 2015.  The Note also provided for the payment of interest, but contradictorily indicated that interest would be paid at the rate of 3.5% "per annum," as well as 3.5% "per month or any partial month." [vi]

20.     Immediately following the Transfer, Lee and LREI obtained appraisals of both the Office Building and the Retail Unit (the "Appraisals").[1]  The Appraisals provided a total fair market value of the Real Estate of $190,000, and a liquidation value of $135,000.  The Appraisals define "Liquidation Value," in part, as the value in a transaction "where [a] normal marketing effort is not possible due to the brief exposure time" and "[p]ayment will be made in cash . . . or in terms of financial arrangements comparable thereto."  The value of the Real Estate at the time of the Transfer within the meaning of Indiana Code § 32-18-2-18 was $190,000.[vii]

---

[1] It is not clear what motivated Lee and LREI to obtain appraisals of the Real Estate *after* the Transfer.

21.     Within two days of the Transfer, Larry formed a new business entity named Epifany Investments, LLC.  Hatfield entered into a verbal lease agreement with Epifany upon being asked by Lee "if it was alright if they stayed in the building" until Hatfield was able to lease it (the "Verbal Agreement").

22.     Pursuant to the Verbal Agreement, Epifany was allowed to occupy the Office Building rent free but was to pay taxes, insurance, and utilities for the property.  In other words, Hatfield received no stream of income under the Verbal Agreement.[viii]

23.     Exactly one year after the Transfer, on February 19, 2015, Hatfield entered into a written lease with Epifany for the Office Building (the "Lease").  Although Epifany was the signatory under the Lease, Hatfield testified that he dealt with Lee.  Like the Verbal Agreement, Epifany was only responsible for taxes, insurance, and utilities, and otherwise paid no rent to Hatfield.  The term of the Lease was for an initial five years, plus several[2] additional five-year terms.  The Lease also provided that it could only be canceled by Hatfield in the event of a default by Epifany.

24.     The Lease contains an integration clause, but Hatfield and Larry also insisted that there was a verbal side agreement whereby Hatfield could terminate the Lease if he located another lessee, regardless of whether Epifany was in default.

25.     Hatfield made minimal efforts to secure another tenant for the Office Building.  Hatfield did show the Retail Unit to a potential tenant, but she eventually lost interest because the property lacks a kitchen.[ix]

---

[2] Section Two of the Lease provides for two five-year renewal periods, while Section Nineteen provides for three five-year periods.

26. Approximately five months after the Transfer, Lee and Hatfield entered into a Consulting Agreement whereby Hatfield agreed to pay Lee $1.00 in exchange for Lee's services. Purportedly as an outgrowth of the Consulting Agreement, Lee worked with Jerry Lamb, a real estate broker, to list the Real Estate with a listing price of $450,000.

27. Hatfield stated that he entered into the Consulting Agreement to generate interest in the Real Estate for leasing purposes. He conceded that no interest was, in fact, generated. Lee stated that he entered into the Consulting Agreement because of his "extensive experience" in commercial real estate, and that he was looking to help Hatfield. Lee acknowledged, however, that Hatfield could have easily retained the broker himself.[x]

28. As for the $450,000 listing price, Hatfield testified that Lee and the broker came up with the figure. Hatfield did not think the figure was unusual based on the sale prices of other properties in the area, and in light of a state redevelopment grant that the city of North Vernon had received. Lamb reiterated the significance of the grant during his testimony, but he also indicated that he threw the listing price against the wall to see if it would stick. The court notes the $450,000 listing price was substantially higher than the fair market value of $190,000 indicated in the Appraisals.

29. The Consulting Agreement did not result in a sale of the Real Estate, and Hatfield remains the fee-simple owner of the property.

30. Notwithstanding the 20-year term of the Note and Hatfield's stated intention to pay the balance of the Purchase Price over five to ten years, Hatfield

purportedly paid the balance of the Purchase Price in cash within about eight months of the Transfer.[xi]

31.     According to Hatfield, between July and October 2014, Lee periodically asked Hatfield to make payments toward the Purchase Price because Lee or one of his related entities needed the money.

32.     Hatfield did not receive a receipt of any kind when he made these payments.  Instead, the Lee Group's administrative assistant, Ruthy Large, placed bundles of cash on a photocopy machine and created an image of the cash purportedly received from Hatfield.  Some of the photocopies also include a bank deposit slip.  Large testified that these photos were created solely for the Lee Group's records.[xii]

33.     Many of the photos show stacks of cash held together by the bands that banks often use to bundle cash.  Some of the bands bore printed dates of 2014.

34.     Hatfield claims that he occasionally buys and sells farm equipment and that, because of these sales, he routinely keeps large amounts of cash at his home; cash that is never deposited in a bank.  However, Hatfield does not remember selling any farm equipment in 2014.[xiii]

35.     Hatfield paid no interest on the remaining balance of the Purchase Price, and testified that he did not believe any interest was due under the Purchase Agreement if he paid off the balance within a year.  Hatfield further testified that he believes LREI released its mortgage on the Real Estate, but he has never sought or received any formal confirmation of this.

36.     On July 23, 2013, the Trustee filed an adversary proceeding against the Lee Group under Adversary Case No. 13-59040 to recover allegedly fraudulent and preferential transfers made by Lee and his related entities to the Lee Group (the "Adversary"). Lee did not disclose those transfers in his bankruptcy petition.

37.     On December 13, 2013, the Trustee moved for the appointment of a receiver in the Adversary. The motion was granted on February 25, 2014 (the "Receiver Order"), and Paul Fouts was appointed to serve as the receiver. [xiv]

38.     Pursuant to an Agreed Consent to Judgment filed in the Adversary, the bankruptcy court ultimately entered Judgment (the "Adversary Judgment") in favor of the Trustee and against the Lee Group in the principal amount of $2.5 million dollars.

## III. Conclusions of Law

1.     The Trustee seeks to avoid the Transfer pursuant to the Indiana Uniform Fraudulent Transfer Act (the "IUFTA").

2.     As previously noted, the bankruptcy court exercised "related to" jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). However, because the bankruptcy court determined that this was not a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2), it was limited to issuing proposed findings of fact and conclusions of law.

3.     The IUFTA provides, in pertinent part:

A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

Ind. Code § 32-18-2-14(1). *See also Genteel, Inc. v. Wireless Ventures, LLC*, 362

F.Supp.2d 992, 1006 (N.D. Ind. 2005).

4.  A "debtor" is "a person who is liable on a claim." Ind. Code § 32-18-2-6.

5.  For purposes of the IUFTA, the Trustee is a "creditor" of the Lee Group.

*See* Ind. Code § 32-18-2-4. The Trustee, however, is attempting to avoid a transfer (a)

made by LREI, not the Lee Group, and (b) of property owned by LREI, not the Lee

Group.

6.  Early in the trial, the bankruptcy court sought clarification from the parties

on this issue, as it would seem to defeat the Trustee's entire action against Hatfield. In

response to the court's concerns, the Trustee argued—and, significantly, Hatfield

seemingly conceded—that LREI should be treated as the Lee Group's alter ego for

purposes of the IUFTA. In other words, the Trustee has invited the court to pierce the

corporate veil in order to reach LREI's assets.[3]

7.  The evidence before the court supports the Trustee's argument. The Lee

Group arguably disregarded the corporate form, as evidenced by the fact that Hatfield's

deposit for the Purchase Agreement was made payable to the Lee Group, not to LREI.

And while Lee seemingly had no management or ownership role in LREI, he is the one—

_____

[3] Under Indiana law, the doctrine of "piercing the corporate veil" can be used in certain
circumstances to hold individuals or another corporation liable for the actions of a corporation.
*See Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship*, 768 N.E.2d 463, 468
(Ind. Ct. App. 2002), *trans. denied*; *Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 462 (Ind. Ct.
App. 2000). The Indiana Supreme Court has emphasized that "corporate law permits the
corporate form to be disregarded and personal liability imposed only where (1) the corporate
form is so ignored, controlled, or manipulated that it is merely the instrumentality of another, and
(2) the misuse of the corporate form constitutes a fraud or promotes injustice." *Escobedo v.
BHM Health Assoc., Inc.* 818 N.E.2d 930, 935 (Ind. 2004).

presumably, as manager of the Lee Group—who negotiated the Purchase Agreement with Hatfield and subsequently negotiated for additional cash payments, which were also made to the Lee Group, not LREI. The evidence also shows that the Real Estate was sold to help generate funds to pay for the Lee Group's legal expenses.

8.    Based on this uncontroverted evidence, the court concludes that it is appropriate to pierce the corporate veil, and to treat LREI as a "debtor" with a "claim" payable to the Trustee for purposes of the IUFTA.

9.    As noted above, the IUFTA defines a transfer as fraudulent regardless of when the claim arose if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." Ind. Code § 32-18-2-14(1).

10.    Fraudulent intent is a question of fact. *Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 703 (Ind. Ct. App. 2001), *reh'g denied, trans. denied*, 774 N.E.2d 515 (Ind. 2002). Fraudulent intent may be inferred from various factors or "badges of fraud" present in a transaction. *Id*. These factors include:

> (1) transfer of property by a debtor during the pendency of a suit; (2) transfer of property that renders the debtor insolvent or greatly reduces his estate; (3) a series of contemporaneous transactions which strip a debtor of all property available for execution; (4) secret or hurried transactions not in the usual mode of doing business; (5) any transaction conducted in a manner differing from customary methods; (6) a transaction whereby the debtor retains benefits over the transferred property; (7) little or no consideration in return for the transfer; and (8) a transfer of property between family members.

*Id*. (citing *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995), *trans. denied*).

11.    A creditor who seeks to have a transfer set aside as fraudulent bears the burden of proving that such transfer was made with fraudulent intent. Lack of

consideration, standing alone, is insufficient to support a charge of fraud. *Id.* The

Trustee has the burden of proving its IUFTA claim by clear and convincing evidence.

*See In re Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992) (applying Illinois law) (citing

*Hofmann v. Hofmann*, 446 N.E.2d 499, 506 (Ill. 1983)).

12.     While the Trustee's motion to appoint a receiver in the Adversary was

pending, the Lee Group rather abruptly divested itself under highly unusual commercial

terms of its office space on the pretext of using the sale proceeds to pay legal fees.  Under

the Purchase Agreement, however, Hatfield was to pay the Purchase Price over time.

Thus, the sale yielded—at least on the face of the contract—a paltry $10,000 in

immediate funds available to pay legal fees.  Conveniently and not so coincidentally, Lee

then persuaded Hatfield to lease the Real Estate back to Epifany—another related entity

created just days after the Transfer—with Epifany responsible only for taxes, insurance,

and utilities.  Based on this undisputed evidence, the court wholly rejects the reason for

the sale offered by Lee, and finds, as it has in other matters, Lee wholly lacking in

credibility.  In the court's view, the sale was undoubtedly an effort to hinder, frustrate,

and delay the Trustee.  It bears emphasizing that, within the Adversary, the bankruptcy

court held that Lee and the Lee Group violated the Receiver Order, finding that Lee

intentionally dissipated the Lee Group's assets following the appointment of the

Receiver, concealed transfers from the Receiver, and misrepresented the Lee Group's

financial situation to the court.  *See Order on Receiver's Request for Instructions, Walro*

*v. The Lee Group Holding Co., LLC*, Adv. Pro. No. 13-59049 (Bankr. S.D. Ind. May 2,

2014).  Viewed with that holding in mind, the Transfer is just a part of the Lee Group's larger effort to frustrate the Trustee and the Receiver.[xv]

13.    Based on this evidence, the court has little difficulty concluding that the Transfer was made with fraudulent intent.  The Transfer in this case is just one of many transfers Lee and his affiliated entities and family members made to frustrate the efforts of numerous creditors, as well as the Trustee, and is consistent with the pattern of conduct already well identified by the bankruptcy court in several other Lee-related actions.  *See, e.g., Findings of Fact and Conclusions of Law*, *The William R. Lee Irrevocable Trust v. Lee*, Adv. Pro. No. 13-59056 (Bankr. S.D. Ind. Dec. 2. 2015), *aff'd*, No. 4:15-cv-00182-RLY-DML, 2017 U.S. Dist. LEXIS 22958 (S.D. Ind. Feb. 17, 2017); *Findings of Fact and Conclusions of Law, Walro v. Brenda Lee*, Adv. Pro. No. 13-59041 (Bankr. S.D. Ind. June 16, 2015), *aff'd*, 567 B.R. 803 (S.D. Ind. 2017).

14.    Having concluded that the Transfer was fraudulent under Section 14(1) of the IUFTA, the court now turns to the defense proffered by Hatfield.  Under the IUFTA, a creditor cannot recover against "a person who took in good faith and for a reasonably equivalent value."  Ind. Code § 32-18-2-18(a).  "Good faith" is an affirmative defense for which the transferee bears the burden of proof.  *See In re Lockwood Auto Grp., Inc*., 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010).  The IUFTA does not define "good faith transferee," nor does the Bankruptcy Code.  *Collier* has observed that because the question of good faith arises in varied circumstances, the term defies an easy or precise definition.  *See* 5 Collier, ¶ 548.07[2][a]; *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) (noting that "good faith" is not susceptible of precise definition).  Accordingly,

courts generally evaluate good faith defenses on a case-by-case basis. *In re Model Imperial, Inc.*, 250 B.R. 776, 797 (Bankr. S.D. Fla. 2000).[4]

15.     In evaluating the good faith element of the defense, a court should apply an objective or "reasonable person" standard, and "look to what the transferee objectively knew or should have known concerning the nature of the underlying circumstances involved with the transfer," not to the subjective knowledge or belief of the transferee. *In re Lockwood*, 428 B.R. at 637. "[A] transferee is not automatically protected by the good faith defense merely because it had no actual knowledge that a fraud was being perpetrated." *Id.* Where a transferee is on notice of suspicious circumstances regarding a transfer, "it is obliged to conduct a diligent investigation which must 'ameliorate' the issues that placed it on inquiry notice in the first place" or it may lose the benefit of the "good faith" defense. *Id*; *see also Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1335-36 (10th Cir. 1996) (stating that "the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment").

16.     The evidence indicates Hatfield knew that Lee himself was in bankruptcy and that the Lee Group was not the vital company it once was. That information alone

---

[4] Indiana case law offers no additional guidance as to the meaning of "good faith" under the IUFTA. In its absence, the court looks to federal decisions interpreting similar provisions within 11 U.S.C. § 548. *See Leibowitz v. Parkway Bank & Tr. Co. (In re Image Worldwide),* 139 F.3d 574, 577 (7th Cir. 1988) (using federal bankruptcy law to define a UFTA term that was derived from the Bankruptcy Code).

may have been enough to put Hatfield on inquiry notice. However, other evidence before the court is arguably more troubling and raises reasonable suspicions about Hatfield's own involvement in the sale.[xvi]

17.    The court finds it suspicious that Hatfield did very little due diligence before purchasing the Real Estate. He insisted that he had never purchased commercial property before, and that he was someone who did business "on a handshake." Nevertheless, the court finds it problematic that he did not have the Real Estate appraised or inspected, hire a real estate agent or attorney, run title work, or investigate the rental history for the Real Estate. One does not have to be experienced in commercial property to appreciate the value of obtaining professional assistance when buying and selling real estate. The fact that Hatfield took very few steps to ensure his investment was sound creates at least an inference that this was not an arm's length transaction.[xvii]

18.    After the Transfer, Hatfield made, at best, minimal efforts to secure tenants for the Real Estate. Immediately following the Transfer, he agreed to an oral lease of the Office Building to Epifany for no rent. A year later, he entered into a written lease with Epifany—again for no rent—which afforded Epifany at least two, if not three, five-year renewal terms. The court fails to understand how this arrangement even remotely served Hatfield's retirement goals.[xviii]

   a.    On October 25, 2016 (after trial, and after the bankruptcy court issued its proposed findings), Hatfield and Epifany executed a Lease Termination Agreement. This Agreement amends the Lease and creates a month-to-

month tenancy. Under this new agreement, Epifany, as lessee, must quit the premises if Hatfield, as lessor, provides 30-days' written notice.

19. The cash payments and acceleration of the payoff following the Transfer raise yet even more questions in the court's mind. Where did Hatfield get the cash to pay off the Purchase Price, and why did he not ask for or receive any receipts for such payments? If the cash derived from his sale of farm equipment—cash that he insists was never deposited with a bank—why was the cash bundled as if it had been obtained from a bank?[xix]

20. Finally, Hatfield's listing of the Real Estate for sale with Lee serving as an unnecessary "consultant" is also perplexing. Hatfield indicated that he wanted to attract tenants, but it is not clear why listing the Real Estate for sale (rather than for rent) and for a price far in excess of its appraised value would accomplish that goal.[xx]

21. In short, the circumstances surrounding the Transfer are simply too bizarre to afford Hatfield the status of a good-faith purchaser. In the court's view, he was either complicit in the Lee Group's fraud, or he had more than ample reason to investigate the circumstances of the Transfer and the Lee Group's finances—something that he wholly failed to do.[xxi]

22. Because the court finds that Hatfield did not purchase the Real Estate in good faith, it need not consider whether the Purchase Price constitutes "reasonably equivalent value" for it. *See* Ind. Code § 32-18-2-18(a) (a transfer is not voidable against a person who *both* "took in good faith" *and* paid "a reasonably equivalent value").[xxii]

23. Because the court finds that Hatfield did not purchase the Real Estate in good faith, it need not determine how much he actually paid for it.[xxiii]

24. Having concluded that the Transfer was fraudulent and that Hatfield is not entitled to the IUFTA's good-faith purchaser defense, the court must now fashion an appropriate remedy. Indiana Code § 32-18-2-17 provides:

(a) In an action for relief against a transfer or an obligation under this chapter, a creditor, subject to the limitations in section 18 of this chapter, may obtain any of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by IC 34-25-2-1 or any other applicable statute providing for attachment or other provisional remedy against debtors generally.

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, any of the following:

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred, its proceeds, or of other property.

(B) Appointment of a receiver to take charge of the asset transferred or of the property of the transferee.

(C) Any other relief the circumstances require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court orders, may levy execution on the asset transferred or its proceeds.

Indiana Code § 32-18-2-18 provides, in relevant part:

(b)  Except as otherwise provided in this chapter, to the extent a transfer is voidable in an action by a creditor under section 17(a)(1) of this chapter, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less.  The judgment may be entered against:

> (1)  the first transferee of the asset or the person for whose benefit the transfer was made; or

> (2)  any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

(c)  If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

25.     Based on the foregoing, the court concludes that avoidance of the Transfer under Indiana Code § 32-18-2-17(a)(1) is an appropriate remedy.  By virtue of the Adversary Judgment against the Lee Group and Indiana Code § 32-18-2-17(b), the Trustee may levy execution on the Real Estate. [xxiv]

26.     Because the Trustee has raised reasonable concerns about the value of the Real Estate due to the Epifany Lease, a conditional money judgment pursuant to Indiana Code § 32-18-2-18(b) is also appropriate.  If the Trustee is unable to execute on the Real Estate free of any lease or other encumbrance by Hatfield, the court shall enter a money judgment against Hatfield for $190,000, the fair market value of the Real Estate at the time of the Transfer.

27.     This court shall retain jurisdiction over this matter until it is clear that either (a) the Trustee was able to execute on the Real Estate free of any encumbrance, or (b) the court needs to issue a money judgment.

28. The Trustee and Hatfield are **ORDERED** to file status reports with this court on or before August 1, 2017.

**SO ORDERED** this 27th day of June 2017.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

[i] Initially, Hatfield requests that the court hold an evidentiary hearing on his status as a good-faith purchaser (i.e., his affirmative defense). But this defense was explicitly raised in the trial below, and the bankruptcy court heard testimony from multiple witnesses on it. The court sees no reason to re-try the issue. This would defeat the purpose of the separation of witnesses that occurred at trial, and would be a poor use of judicial resources. Parties should not view proceedings in the bankruptcy court as a "practice run." Hatfield also appears to request that the court hold oral argument on the parties' objections. This request is denied; the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court.

[ii] Hatfield objects to Finding No. 5 on the basis that it omits relevant, related evidence. Put another way, he maintains that while these facts are true, there is important contextual information that should nonetheless be included in the finding. Without these additional facts, the finding is allegedly misleading. The court disagrees. As the Trustee notes, the bankruptcy court was not required to make findings on every detail in this case. Rather, the court merely needed to recount the material facts so that an appellate court would be able to understand the decision and conduct meaningful review. *See Xodus v. Wackenhut Corp.*, 619 F.3d 683, 686 (7th Cir. 2010) (a court making findings of fact "must include sufficient subsidiary facts so that we can clearly understand the steps by which it reached its ultimate conclusion," but "it need not address each piece of evidence"). Because this finding is sufficiently comprehensive and supported by the record, Hatfield's objection is **OVERRULED**.

[iii] Hatfield objects to Finding No. 11 on the basis that it omits relevant, related evidence. Like his objection to Finding No. 5, this objection is **OVERRULED**.

[iv] Hatfield objects to Finding No. 12 on the basis that it omits relevant, related evidence. Like his objection to Finding No. 5, this objection is **OVERRULED**.

[v] Hatfield objects to Finding No. 15 on the basis that it omits relevant, related evidence. Like his objection to Finding No. 5, this objection is **OVERRULED**.

[vi] Hatfield requests that the court add a new finding: "If Hatfield had paid off the 20-year note according to its terms, he would have paid a total of $162,661.80." This request is denied, as the finding is unnecessary given the court's ultimate holding.

[vii] The last sentence in Finding No. 20 is not in the proposed finding. The Trustee requests that it be added. That request is granted.

[viii] Hatfield objects to Finding No. 22 on the basis that it omits relevant, related evidence. Like his objection to Finding No. 5, this objection is **OVERRULED**.

[ix] Proposed Finding No. 25 states that Hatfield "took no steps to secure another tenant for the Office Building." Hatfield objects on the basis that this is not supported by the evidence. The Trustee agrees that the bankruptcy court's phrasing is not completely accurate, but the parties disagree on how the finding should be modified. The court adopts the Trustee's

recommendation: replacing "took no steps" with "made minimal efforts." Accordingly, Hatfield's objection is **SUSTAINED IN PART**.

[x] Proposed Finding No. 27 states, "Neither Lee nor Hatfield provided a cogent explanation for the Consulting Agreement." Hatfield objects on the basis that this is not supported by the evidence. Without opining on its accuracy, the court excludes this sentence because it is not necessary to the court's ultimate holding. Accordingly, Hatfield's objection is **SUSTAINED**.

[xi] Hatfield objects to Finding No. 30 on the basis that it improperly includes the word "purportedly." He insists that he did, in fact, pay the balance of $115,000 in cash. This fact is relevant to his good-faith purchaser defense, and, more specifically, the issue of whether he paid "reasonably equivalent value." Indiana Code § 32-18-2-18(a) provides, "A transfer or an obligation is not voidable under section 14(1) of this chapter against a person who took in good faith and for a reasonably equivalent value . . . ." Thus, in order to prevail on his affirmative defense, Hatfield must show that he acted in good faith *and* that he paid reasonably equivalent value. Alternatively, Section 18(d) provides that even if a transfer will be avoided, a good-faith purchaser is entitled to a lien on the asset or a credit on the judgment in the amount he paid to the debtor. Because the court ultimately finds that Hatfield did not act in good faith, it makes no difference how much he actually paid for the Real Estate. This dispute is therefore immaterial. Accordingly, Hatfield's objection is **OVERRULED**.

[xii] Hatfield objects to Finding No. 32 on the basis that it improperly includes the word "purportedly." Again, he insists that he did, in fact, make these payments. For the reasons provided above, Hatfield's objection is **OVERRULED**.

[xiii] Proposed Finding No. 34 states, "Hatfield, however, admitted that he did not sell any personal property in 2014." Hatfield objects on the basis that this is not supported by the evidence. The court agrees. When asked if he sold any property in 2014, he testified, "Nothing comes to mind, John, but that – that doesn't mean that I didn't. I don't – I don't remember anything that I sold specifically in 2014 . . . ." The finding has been amended to reflect this testimony. Accordingly, Hatfield's objection is **SUSTAINED**.

[xiv] Hatfield objects to Finding No. 37 on the basis that it omits relevant, related evidence. Like his objection to Finding No. 5, this objection is **OVERRULED**.

[xv] Hatfield objects to Conclusion No. 12 on the basis that it includes the phrase "conveniently and not so coincidentally." He maintains that this characterization is not supported by the record. The court disagrees. Accordingly, Hatfield's objection is **OVERRULED**.

[xvi] Hatfield objects to Conclusion No. 16 on the basis that it is not supported by the evidence. Specifically, he emphasizes that he testified at trial that he did *not* know Lee was in bankruptcy. But Hatfield ignores that Lee testified that everyone in the small city of North Vernon knew he was in bankruptcy. Additionally, Hatfield testified that he (a) knew Lee needed money, (b) had seen the Lee Group, a once vibrant company, dwindle to nothing, (c) noticed that while the Real Estate had once been full of people, it was only being used by a few people at the time of the Transfer, and (d) had heard rumors about litigation between Lee and some of his family

members. The challenged statement in Conclusion No. 16 represents a credibility determination–the bankruptcy judge simply did not find Hatfield credible when he claimed that he did not know Lee had filed bankruptcy. This is a reasonable conclusion based upon the evidence. Accordingly, Hatfield's objection is **OVERRULED**.

[xvii] Hatfield objects to Conclusion No. 17, seemingly on the basis that it focuses on the wrong facts. He emphasizes that he purchased the Real Estate from LREI, not Lee. So even if the court finds that he knew Lee was in bankruptcy, there was no reason for Hatfield to suspect that LREI could not deliver clear title. Thus, there was no need for him to take the steps mentioned in this conclusion, or so he claims. The court disagrees. Initially, running a title search, obtaining an appraisal, and having the property professionally inspected are standard aspects of due diligence. A reasonable person would have taken each of those steps. Moreover, the evidence does not support the notion that Hatfield knew he was dealing with LREI, or even that he was aware of any distinction between the Lee Group and LREI. Because Hatfield did not conduct a title search on the Real Estate, he had no reason to know what person or company held the title until he was presented with the Purchase Agreement. Furthermore, his check for the down payment of $10,000 was made out to the Lee Group (*not* LREI), the Lee Group occupied the building prior to the sale, and he negotiated the sale with Lee. This conclusion is reasonable in light of the evidence. Accordingly, Hatfield's objection is **OVERRULED**.

[xviii] Hatfield objects to Conclusion No. 18 on the basis that it is not supported by the evidence. He submits new, post-trial evidence that he placed "for rent" signs at the Real Estate in 2014. Nonetheless, it is still accurate to state that Hatfield made minimal efforts to rent the property. He also suggests that the bankruptcy court's discussion of the Lease is now inaccurate because the Lease was terminated by the Lease Termination Agreement (which is also new, post-trial evidence). The court adds Conclusion No. 18a to reflect this new information. Therefore, Hatfield's objection is **SUSTAINED IN PART**.

[xix] Hatfield objects to Conclusion No. 19, essentially because he disagrees with its implications. To answer some of the bankruptcy court's questions, he cites to his trial testimony. For example, he asserts that he did not keep receipts because he trusted the Lee Group to keep records. The bankruptcy court heard this testimony but simply did not find Hatfield credible on the matter, and this court agrees with that conclusion. Hatfield attempts to address other concerns by offering new, post-trial evidence in the form of an affidavit. In his affidavit, Hatfield makes a general claim that he keeps bank bands at his home and uses them to organize his cash savings. But, as the Trustee notes, his carefully-worded affidavit does not contain a clear answer to the bankruptcy court's question. Hatfield does *not* testify that he put bands on the bills depicted in the photo copies. Rather, it seems that he wants the court to draw that inference on its own. Additionally, the court notes that some of the bank bands depicted in the photo copies have a date stamped on them (e.g., July 1, 2014), but none of the bands pictured in Hatfield's affidavit appear to have been stamped. The bankruptcy court's concerns are reasonable, and this court adopts them. Accordingly, Hatfield's objection is **OVERRULED**.

[xx] Hatfield objects to Conclusion No. 20 for the reasons advanced in his objection to Finding No. 27. The court sees no reason to alter or strike this conclusion. Therefore, Hatfield's objection is **OVERRULED**.

Hatfield objects to Conclusion No. 21, arguing that the "bizarre" nature of these circumstances points to truth rather than fraud. He suggests that if he had been complicit with Lee, he would have concocted a better story and kept better records. This court agrees with the bankruptcy court's assessment of the evidence. Accordingly, Hatfield's objection is **OVERRULED**.

[xxii] Proposed Conclusion No. 22 states,

> Even if Hatfield purchased the Real Estate in good faith, he did not pay "reasonably equivalent value" for it. The Appraisals suggest a liquidation value for the Real Estate of $135,000. But such value was based on cash or cash-equivalent terms. Under the Purchase Agreement, Hatfield agreed to pay the $125,000 Purchase Price with only $10,000 down and annual payments over twenty years to follow, with annual interest at 3.5%. This is hardly the equivalent of cash. The fact that Hatfield allegedly paid off the balance of the Purchase Price in cash within eight months of the Transfer does not alter that conclusion. As such, the court rejects Hatfield's contention that the liquidation value of the Real Estate is relevant to the court's analysis. Rather, the court finds the fair market value of $190,000 to be a more appropriate measure of "reasonably equivalent value." The Purchase Price fell far short of that mark.

Hatfield objects to this proposed conclusion on the basis that it is not supported by the evidence. He argues that he did pay "reasonably equivalent value" for the Real Estate. But this was a finding in the alternative by the bankruptcy court. Because this court need not reach the issue, it declines to opine on the matter. Accordingly, Hatfield's objection is **OVERRULED**.

[xxiii] Proposed Conclusion No. 23 states,

> Even assuming that the Purchase Price constitutes "reasonably equivalent value," the evidence does not establish that the Lee Group received *anything* more than Hatfield's $10,000 deposit for the Real Estate. There is no paper trail for the cash payments allegedly made by Hatfield. The evidence presented to the court does not include any cancelled checks or withdrawal slips for Hatfield's alleged payments. Nor was Hatfield able to produce any receipts. The only evidence of the cash payments consists of photos of cash bundles in indeterminate amounts and a handful of deposit slips. The court does not find that evidence compelling proof that Hatfield actually made the payments.

Hatfield objects to this proposed conclusion on the basis that it is not supported by the evidence. He argues that he paid $125,000 for the Real Estate. This was another a finding in the alternative by the bankruptcy court. Because this court need not reach the issue, it declines to opine on the matter. Accordingly, Hatfield's objection is **OVERRULED**.

Proposed Conclusion No. 25 states,

> Based on the foregoing, the Court concludes that avoidance of the Transfer is an
> appropriate remedy.  The Court further concludes that by virtue of the Adversary
> Judgment and Indiana Code § 32-18-2-17(C)(b), the Trustee may execute and levy
> on the Real Property, subject to a $10,000 lien in Hatfield's favor.

Both Hatfield and the Trustee object to this proposed conclusion.  Hatfield argues that even if the court determines he did not pay "reasonably equivalent value," he is still entitled to a $125,000 lien as a good-faith purchaser.  But, as discussed above, Hatfield is not a good-faith purchaser. He is therefore not entitled to a lien at all.  *See* Ind. Code § 32-18-2-18(d).  Accordingly, his objection is **OVERRULED**.

The Trustee argues that this proposed conclusion does not provide complete relief because any sale of the Real Estate would have to be subject to the Epifany Lease.  The Trustee fears that this will significantly decrease the value of the property.  Therefore, he originally sought a money judgment in the amount of $180,000, representing the value of the Real Estate at the time of the Transfer ($190,000) less Hatfield's deposit ($10,000).  In response to the Lease Termination Agreement, the Trustee now seeks a "conditional judgment."  He asks that a money judgment be entered only if he is unable to execute on the Real Estate free of any lease or other encumbrance by Hatfield.  The court finds that this is the most appropriate remedy.  Accordingly, the Trustee's objection is **SUSTAINED**.  This conditional judgment is reflected in Conclusion No. 26.